101 F.Supp.2d 500 (2000)
UNITED STATES of America, ex rel. Patrick WILKINS, Plaintiffs,
v.
NORTH AMERICAN CONSTRUCTION CORPORATION, CH&A Corporation, et al., Defendants.
No. CIV.A. H-95-5614.
United States District Court, S.D. Texas, Houston Division.
June 13, 2000.
*501 *502 *503 Hays Jenkins, Jr., Office of U.S. Attorney, Houston, TX, Michael F. Hertz, Department of Justice, Civil Division, Ben Franklin Station, Elizabeth A. Rinaldo, U.S. Dept of Justice, Civil Division, Washington, DC, Robert N. Hinton, Robert N. Hinton and Associates, Allan G. Levine, Attorney at Law, Michael John Hinton, Sr., Hinton Sussman et al., Houston, for United States of America, Patrick Wilkins, plaintiffs.
Ronald Hornberger, Plunkett & Gibson, Lewin Plunkett, Plunkett and Gibson, San Antonio, TX, Alan J. Sobol, Attorney at Law, David M. Bizar, O'Connell Flaherty et al., Hartford, CT, David Patrick Long, Patton Boggs LLP, Dallas, Mary Elizabeth Bosco, Patton Boggs, Washington, DC, David J. Farber, Patton Boggs, Washington, DC, David J. Beck, Beck Redden and Secrest, Houston, James A. Bensfield, Miller & Chevalier, Peter Hutt, Miller & Chevalier, Gregory Brown, Miller & Chevalier, Heidi A. Sorensen, Miller & Chevalier, Washington, DC, for North American Construction Corporation, CH&A Corporation, GAB Business Services Inc., EVI Cherrington Environmental Inc., Energy Ventures Inc., Weatherford International Inc., defendants.

MEMORANDUM OPINION AND AMENDED ORDER
ROSENTHAL, District Judge.
In 1995, relator Patrick Wilkins, a former chief operating officer of a subcontractor to a drilling contract with the Army Corps of Engineers, filed this suit under the qui tam provisions of the False Claims Act, 31 U.S.C. §§ 3729-3730. Wilkins *504 filed suit under seal so that the United States government could investigate his allegations and determine whether to exercise its statutory right to intervene and prosecute this lawsuit. 31 U.S.C. § 3730(b)(3). Three years later, the government completed its review and filed its complaint upon intervention. In that complaint, the government adopted most, but not all, of the relator's claims and added claims the relator had not raised.
Defendants, the general contractor and two subcontractors, subsequently moved to dismiss both complaints for failure to plead with sufficient particularity under Federal Rule of Civil Procedure 9(b) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In response to defendants' motions and this court's orders, the United States filed two amended complaints and the relator filed an amended complaint. Defendants then moved to dismiss the government's second amended complaint and the relator's first amended complaint, urging that no further opportunities to amend should be allowed.
The complaints include three sets of allegations. The first centers on the government's contention that the two subcontractor defendants submitted "hidden" or "padded" waste costs in an October 1992 proposal to the Army Corps of Engineers for drilling, and that all three defendants later included these hidden costs in requests for progress payments, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(2). (Counts IV and V, Government's Second Amended Complaint, Docket Entry No. 95, pp. 44-46). Defendants move to dismiss the claims based on the hidden waste costs. (Docket Entry Nos. 107 and 111).
The second set of allegations is based upon a Request for Equitable Adjustment defendants submitted to the Army Corps of Engineers in May 1994. The government and the relator both allege that for the purpose of obtaining an equitable adjustment, defendants falsely claimed that the government was liable for costs related to differing site conditions and that the government had superior knowledge about these site conditions. Based on these claims, the government asserts causes of action against the general contractor under the Contract Disputes Act, 41 U.S.C. § 604 (Count I, Second Amended Complaint, Docket Entry No. 95, p. 42) and against all defendants for violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (a)(2) (Counts II and III, id., pp. 43-44); conspiracy to have the government pay false claims under 31 U.S.C. § 3729(a)(3) (Count VI, id., pp. 46-47); and common law fraud (Count VII, id., pp. 47-48). The relator asserts causes of action under 31 U.S.C. §§ 3729(a)(1)-(a)(3). Each defendant has moved to dismiss all the REA-based claims against it. (Docket Entry Nos. 105, 107, 109, 110, 111, and 113).
The third set of allegations involves the relator's claim that the parent company of one of the subcontractors is liable, both under an alter ego theory and independently. The parent company defendant has moved to dismiss this claim. (Docket Entry No. 105).
In their motions to dismiss the government's second amended complaint, the two subcontractor defendants assert that as a matter of law, the government has not sufficiently pleaded that the subcontractor defendants made false statements about waste removal costs in the bid proposal and contract. All defendants assert that the government has not sufficiently pleaded that they made false statements in connection with the Request for Equitable Adjustment ("REA"). All defendants assert that the relator's complaint should be dismissed on the same grounds as the government's second amended complaint. One of the defendants also asserts that the relator's complaint should be dismissed as superseded to the extent the government adopted it and as deficiently pleaded to the extent it asserts claims the government did not adopt.
*505 This court entered a preliminary order dated March 31, 2000, on these claims. (Docket Entry No. 143). This court now issues this Memorandum Opinion and Amended Order, setting out the reasons for those rulings. and sets out the reasons for the rulings. This Memorandum Opinion and Amended Order differs from the earlier order only in that it does not dismiss any part of the government's Contract Disputes Act claim against defendant North American Construction Company.
For the reasons stated in detail below, this court GRANTS the defendants' motions to dismiss the government's padded waste claims without leave to amend; DENIES the defendants' motions to dismiss the government's claims arising from the REA; DENIES the motion to dismiss the complaint of the relator as superseded; GRANTS the motion to dismiss the claims the relator has asserted against the parent company of one of the subcontractors; and GRANTS in part the defendants' motions to dismiss the relator's claims relating to the REA, with leave to amend.

I. Factual and Procedural Background

A. The Parties and the Contracts: The Facts Relating to the Padded Waste Claim
On September 16, 1991, the Army Corps of Engineers (the "Corps") awarded North American Construction Corporation ("NACC"), a Texas corporation based in San Antonio, Texas, contract Number DACA56-91-C-0110. The contract required NACC to construct a Groundwater Treatment Facility at Tinker Air Force Base in Oklahoma. The Corps contract required NACC to construct a treatment plant to remove contaminants from groundwater underneath an aircraft maintenance facility located on the base. The contract was a competitively bid fixed-price contract. Defendant CH & A Corporation, a Texas corporation and a subsidiary of GAB Business Services, Inc. ("GAB"), became a subcontractor to NACC for certain of NACC's contractual obligations to the Corps when CH & A acquired the personnel, assets, and the obligations to NACC under the contract of U.S. Testing, Testing Engineers Division. Relator Patrick Wilkins is a former Chief Operating Officer of CH & A.
The contract originally called for five vertical wells to be drilled inside the aircraft maintenance facility. On September 24, 1992, the Corps issued unilateral contract modification 9, substituting five horizontal wells for the vertical wells. The modification fell within the scope of CH & A's subcontract with NACC. CH & A sought competitive bids for contract modification 9. In a letter dated October 16, 1992, defendant EVI Cherrington Environmental ("ECE"), a Texas corporation and a wholly-owned subsidiary of defendant Weatherford International, Inc.[1] during the relevant period, wrote "to confirm our price with regard to drilling five approximately 1000 feet wellbores...." In this letter, ECE proposed a fixed price of $1,295,000 for "Total Project Excluding Waste Disposal." ECE proposed a flat price of $215,000 to "store, haul and dispose of the drilling wastes" up to 40 cubic yards of solid waste and 120,000 gallons of liquid waste. In the letter, ECE stated that if the quantity of waste exceeded either of these amounts, ECE and CH & A would negotiate a unit rate for the disposal of the additional waste at the then-prevailing market rate. ECE also proposed that additional demurrage charges should be levied for wastes the Corps did not allow ECE to remove within thirty days after their production.
CH & A forwarded the bid proposals it received to the Corps administrative contracting officer, Dan Johnson. The Corps concluded that ECE had submitted the lowest responsive bid. On October 30, 1992, CH & A and ECE executed a Subcontract *506 Agreement for part of the work called for in unilateral contract modification 9. The Subcontract Agreement identified the "Contract Amount" of $1,295,000 as covering the following tasks: "Drill, Install, and Develop Five Horizontal Extraction Wells; Install Pump Systems; Manage Wastes. Actual disposal of wastes is to be paid per the unit prices shown in item 36.C." (Docket Entry No. 58, Ex. A, p. 19). Section 36.C of the Subcontract Agreement set out unit rate prices for the disposal of solid and liquid industrial wastes, at rates of $1.50 per gallon of liquid hazardous waste and $175.00 per cubic yard of solid hazardous waste. (Id., p. 18). The Subcontract Agreement broke down the fixed contract amount into broad categories of prices: Total Well Materials; Mobilization & Demobilization; and Drill, Complete and Develop Wells. This third category was broken down only by a total price for each of the five wells. The contract set a fixed price that ECE would receive for the drilling and waste management work, but did not specify any cost component of the work. The price of the waste disposal work was not included in the fixed price of $1,295,000 and was to be paid according to the unit rate prices listed in section 36.C of the contract.
During the contract work, ECE submitted progress payment requests under the Subcontract Agreement. The payment requests included amounts for drilling work and for the waste disposal work performed. Some of the payment requests broke out and separately identified cost amounts for waste management and storage. The government does not allege that these charges are incorrect or inflated. Rather, the government contends that the payment requests, based on the percentage of work completed for each well until the total price of $1,295,000 was reached, were false because they included $280,000 in costs for waste removal work. (Second Amended Complaint, Docket Entry No. 95, ¶¶ 33-36). The government contends that if it had known that the total contract price of $1,295,000 for drilling and waste management included $280,000 that in fact represented costs for waste removal, it would not have agreed to pay ECE that total price.

B. The Facts Relating to the Request for Equitable Adjustment Claims
It is undisputed that ECE encountered problems in the horizontal well drilling that delayed the completion of the work under the Subcontract Agreement and resulted in cost overruns. It is also undisputed that the government approved the work. The quality of the work is not an issue.
During the contract work, and after its conclusion, ECE, CH & A, and NACC had a number of discussions and meetings about the problems and delays encountered. ECE asserted that it had based its bid to CH & A on verbal representations from CH & A and on drilling logs CH & A provided that described the subsurface soil as "predominately silty glaze with some soft fractured sandstone." Within a few days of beginning to drill, ECE realized that the subsurface soil was significantly harder and more heavily cemented than CH & A had described, making drilling slower and more costly.
CH & A had given ECE "soil boring logs" that CH & A, rather than the Corps, had prepared. Both NACC and CH & A had other vertical well logs that the Corps had prepared and included in the bid package for the project. However, neither NACC nor CH & A gave ECE these Corps bid package logs.
ECE employees became aware of the existence of the Corps bid package contract boring logs for vertical wells at a November 6, 1992 meeting between representatives of ECE, NACC, the Corps, and CH & A. On November 10, 1992, ECE employee David May wrote to CH & A employees Bayani Abueg and David Rendini, stating that the logs CH & A had *507 given to ECE did not accurately represent the subsurface soil conditions at the site. Rendini prepared a Project Summary Report dated February 24, 1993 for Patrick Wilkins, CH & A's COO. In this report, Rendini stated that the logs CH & A gave to ECE did not materially differ from the Corps bid package contract logs that CH & A had failed to provide to ECE. Rendini also noted that ECE had been given an opportunity to obtain copies of other, horizontal Corps drilling logs produced from two previous horizontal well bores drilled in the area, although not at the same site. The Corps had not attached these horizontal well logs to any of the bid or contract documents. CH & A blamed the delays on ECE's own "incompetence," rather than on the inaccuracy of the logs CH & A did give to ECE or on CH & A's failure to give ECE the Corps vertical well logs.
ECE commissioned a study by American Environmental Consultants, Inc. ("the AMENCO report") that compared the Corps contract vertical well logs CH & A did not give to ECE before it tendered its bid, the CH & A logs that ECE did receive, and the actual subsurface soil conditions. Wilkins wrote a memorandum dated June 28, 1993, to John Darden, a senior vice president of GAB, the parent company of CH & A, in which he discussed the possibility that ECE might sue CH & A over the logs.
On August 25, 1993, Alton Watson and Dan Eaton of ECE met with Roger Craddock, Patrick Wilkins, Ed Bove, and David Rendini of CH & A to discuss ECE's claim that it had incurred extra costs of $547,635.66 because the logs CH & A had prepared and given to ECE did not accurately represent the subsurface soil conditions encountered. At the meeting, ECE presented a cost overrun report it had prepared.
In February 1994, ECE prepared a draft of a Request for Equitable Adjustment (REA). In this draft REA, ECE asserted that it had incurred $547,635.66 in cost overruns because the CH & A well logs CH & A gave to ECE before ECE submitted its bid did not accurately describe the soil conditions. ECE attached a copy of the AMENCO Report to the REA and forwarded the REA to CH & A on February 25, 1994.
On March 4, 1994, a NACC employee telephoned Wilkins to express NACC's concern that the draft REA included references to the dispute between ECE and CH & A over the different sets of drilling logs. On March 8, 1994, Doug Reitmeyer and Dan Sparkman of NACC, David Rendini and Patrick Wilkins of CH & A, and Dan Eaton of ECE met to discuss the concerns. Reitmeyer told Eaton that ECE should remove critical references to CH & A from the REA, because if CH & A and ECE blamed each other for the differing site conditions, the government would be less likely to approve the claim.
ECE drafted a revised REA dated March 15, 1994. In the revised REA, ECE stated that it had expected, and based its bid on, different site conditions than it encountered. ECE referred to "government boring logs" as those on which it based its bid. In the second amended complaint, the government alleges that this deliberately ambiguous phrase in fact referred to the logs that CH & A had prepared and provided to ECE. The government alleges that ECE referred to these logs as "government boring logs," although they were not the logs the Corps attached to the contract bid documents, on the theory that the government had paid CH & A to prepare the logs. ECE did state in the March 15, 1994 REA that when it submitted its bid, it had not received the Corps contract boring logs for vertical wells that the Corps had included in the bid package, but that CH & A had failed to transmit. ECE also stated that it had not known about either the existence or contents of the Corps logs of the experimental horizontal wells. ECE asserted that the Corps' failure to disclose or include the logs of the horizontal wells in the bid package for the five new horizontal *508 wells called for in unilateral contract modification 9 constituted a withholding of superior knowledge.
On March 16, 1994, CH & A forwarded ECE's March 15, 1994 draft claim as part of CH & A's claim submission to NACC. On April 6, 1994, Wilkins, as CH & A's COO, signed CH & A's certification for the March 16, 1994 claim.
On May 10, 1994, Reitmeyer and Sparkman (of NACC), Watson and Eaton (of ECE), and Wilkins (of CH & A) participated in a telephone conference. In their amended complaints, the government and the relator allege that Reitmeyer urged CH & A not to include in the REA any assertions that blamed ECE for the delays and cost overruns. The government and the relator allege that Reitmeyer also urged ECE to revise the REA to blame the government, not CH & A or NACC, for any misinformation as to the site conditions. Reitmeyer of NACC and Dan Eaton of ECE discussed removing the AMENCO report from ECE's draft REA. The AMENCO report stated that the contract logs the Corps had given to CH & A before ECE's bid accurately represented the site conditions. Reitmeyer suggested replacing the AMENCO report with a newspaper article, to avoid creating a gap in the exhibit list.
On April 4, 1994, ECE's president certified the ECE pass-through claim. Although the April 4, 1994 ECE claim bore a March 15, 1994 date, ECE had substituted the newspaper article for the AMENCO report and made changes to the REA text. In the April 4, 1994 REA, ECE stated that it learned after it began drilling that the Corps had not included logs from the experimental horizontal wells in the bid package and had not previously disclosed the existence or contents of those logs. ECE asserted that these horizontal well logs gave the government superior knowledge of the subsurface conditions associated with drilling horizontal wells at the contract site. In this suit, the government alleges that ECE's statement about the horizontal well logs in the April 1994 REA is inconsistent with other documents and false. The government points to the February 24, 1993 CH & A project summary, which states that after ECE submitted its bid, but before it began drilling, the government told both ECE and CH & A about the logs of the experimental horizontal wells and made those logs available to ECE in a meeting. The government also points to an October 21, 1992 ECE entry in a chronology of the project, stating that ECE had asked the Corps for logs of horizontal wells at the site, showing ECE's knowledge of the existence of those logs.
In the April 1994 REA, ECE stated that it had submitted its bid based on soil boring logs that did not match the actual site conditions. ECE stated that it had based its bid on the government bid package, CH & A's representations, and the soil boring logs CH & A had provided. However, ECE deleted the statement, included in the earlier draft REA, that the bid package CH & A gave to ECE omitted the Corps vertical well boring logs. ECE also did not include the statement from the earlier draft REA that the soil boring logs CH & A did provide were, in ECE's judgment, faulty. ECE did not include the AMENCO report, which criticized the soil boring logs CH & A gave to ECE and found that the government logs that CH & A failed to provide were consistent with the actual site conditions. Instead, ECE asserted that the government was liable for the cost overruns due to differing site conditions and superior knowledge.
In the certification of the REA, Watson, ECE's president, stated that the REA was made in good faith; that the supporting data was accurate and complete to the best of ECE's knowledge and belief; and that the amount requested accurately reflected the contract adjustment for which ECE believed the government to be liable.
On April 6, 1994, Wilkins signed the REA certification on behalf of CH & A, stating that the claims were made in good *509 faith; that the supporting data was accurate and complete to the best of CH & A's knowledge and belief, and that the amount requested accurately reflected the contract adjustment for which CH & A believed the government was liable. The government alleges that Wilkins certified the March 15, 1994 draft claim, which included the AMENCO report. However, the government alleges that CH & A withheld from the government its belief that ECE's own performance caused the project delays or its belief that the logs CH & A gave to ECE accurately described the subsurface conditions.
On May 11, 1994, Donald Sparkman, NACC's senior project manager, signed the REA certification, stating that the claim was made in good faith; that the supporting data was accurate and complete to the best of NACC's knowledge and belief, and that the amount requested accurately reflected the contract adjustment for which NACC believed the government to be liable.
The government alleges that before ECE bid on the modification 9 work, neither NACC nor CH & A had given ECE the Corps contract logs for vertical wells; that ECE based its bid on the logs CH & A prepared; and that the Corps had made logs for the previously drilled experimental horizontal logs available to ECE before ECE had begun to drill, though not until after it had bid. The government also alleges that none of the defendants had examined the horizontal well logs before submitting the REA. Despite the lack of knowledge of what these logs contained, defendants certified the assertion in the REA that these logs contained "vital" information that should have been included in the bid package given to ECE. The government alleges that if defendants had examined the horizontal well logs, they would have learned that these were gamma logs, which measured radioactivity, rather than subsurface soil conditions. The government asserts that these logs contained neither "vital" nor even relevant information about subsurface soil conditions. The government concludes that defendants' claim that the government had superior knowledge about subsurface conditions that it withheld was made either falsely or with reckless disregard for the truth.
On May 16, 1994, the Corps received the REA. It included a $3.9 million claim for cost overruns and delays for differing site conditions. The government investigated the claim under the Contract Disputes Act, 41 U.S.C. §§ 601-13. As a result of the investigation, the Corps rejected the claim for cost adjustments based on differing site conditions and superior knowledge. The core of the government's and the relator's case is that the defendants coordinated their submissions to make it appear that the government had caused the delay and overruns, despite their belief that acts or omissions of the defendants had caused or contributed to cause the problems.

II. The Issues Presented
The government's arguments as to the first set of issues, arising from the padded waste claim, require this court to focus on the extent to which a government subcontractor must either affirmatively disclose the costs of performing a government fixed price contract or risk liability under the False Claims Act. The government asserts that it reasonably assumed that the fixed price it agreed to pay for drilling the wells did not include any costs for waste removal because the price for waste removal was separately classified. Defendants ECE and CH & A respond that the government's theory rests on a duty to disclose that has neither a contractual nor a statutory basis. Defendants assert that by bidding and approving a fixed price contract, the government chose not to impose an obligation to disclose the cost basis of the fixed price bid or contract. In the absence of such a duty to disclose, the failure to do so cannot, argue defendants, amount to a false or fraudulent claim as a matter of law.
*510 The government's argument as to the REA rests on a very different analysis. The government asserts that in the REA, the defendants cooperated to shift the blame for increased costs and contract delays from each other to the government. The government alleges that the steps defendants took to build a case of the Corps' superior knowledge of differing site conditions furnish the necessary elements to state a cause of action under the False Claims Act and for common law fraud.
Defendants respond that the false statements the government describes are litigation arguments the contractor and subcontractors submitted to support their position under the Contract Disputes Act. Defendants assert that the government is converting litigation arguments into false claims. Defendants also assert that the document the government makes the basis of its case, the REA that each of the defendants certified, does not assert that the government was wholly responsible for the cost overruns and delays, but merely that the government contributed to cause the problems by not earlier providing the horizontal well logs.
Each of these arguments is examined below.

III. The Applicable Legal Standards

A. The Rule 9(b) Standard
FED. R. CIV. P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Id. "Although the particularity demanded by Rule 9(b) differs with the facts of each case, a plaintiff pleading fraud must set forth `the who, what, when, and where ... before access to the discovery process is granted.' Anything less fails to provide defendants with adequate notice of the nature and grounds of the claim." Hart v. Bayer Corp., 199 F.3d 239, 248 n. 6 (5th Cir.2000) (citing Guidry v. Bank of LaPlace, 954 F.2d 278, 288 (5th Cir.1992); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); and quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997)) (alteration in original; internal citations omitted). The second sentence of Rule 9(b) allows a plaintiff to make conclusory allegations as to defendant's knowledge of the true facts and of defendant's intent to deceive. 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297.
Although a district court may dismiss a claim for failure to plead fraud with particularity, "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." Id. (citing O'Brien v. National Property Analysts Partners, 936 F.2d 674, 675-76 (2d Cir.1991)). Despite the requirement that fraud be pleaded with particularity, "fraud may be pleaded without long or highly detailed particularity." Guidry v. United States Tobacco Co., 188 F.3d 619, 632 (5th Cir.1999) (citing 12A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE, App. D, Form 13 (1999)). Rule 9(b) must be read together with the Rule 8(a) requirement that pleadings be "`simple, concise, and direct'"; Rule 9(b) does "not reflect a subscription to fact pleading." Williams v. WMX Techs., Inc., 112 F.3d at 178 (quoting FED. R. CIV. P. 8(a)(2)). The Williams court also observed that "courts have emphasized that Rule 9(b)'s ultimate meaning is context-specific." Id.
Rule 9(b) has four purposes: to ensure that the defendant has sufficient information to formulate a defense by having notice of the conduct complained of; to protect defendants against frivolous suits; to eliminate fraud actions in which all the facts are learned after discovery; and to protect defendants from undeserved harm to their goodwill and reputation. See Harrison *511 v. Westinghouse Savannah River Co., 176 F.3d 776, 783 (4th Cir.1999). Rule 9(b) must be interpreted and applied in light of these purposes. The Fifth Circuit has specifically held that "[t]he complaint in a False Claims Act suit must fulfill the requirements of Rule 9(b)." United States ex rel. Russell v. Epic Healthcare Management Group, 193 F.3d 304, 308 (5th Cir.1999) (citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 (5th Cir.1997)).[2]
The Fifth Circuit has added a fifth element to the "who, what, when and where" that Rule 9(b) clearly requires, but has described this fifth element in various ways. In Tuchman, the court held that "Rule 9(b) requires the plaintiff to allege `the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" Tuchman, 14 F.3d at 1068 (quoting Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139 (5th Cir.1992)) (alteration in original; internal quotation marks omitted); see also Russell, 193 F.3d at 308. In Williams v. WMX Techs., Inc., the Fifth Circuit set out three different standards including the fifth element, and one that did not. The first standard the Williams court cites is the Tuchman "what the person obtained thereby" standard. See Williams, 112 F.3d at 177. The second is a "why" standard: "As the Second Circuit has noted, articulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. We agree with the Second Circuit's approach." Williams v. WMX Techs., Inc., 112 F.3d at 177-78 (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)) (internal citation omitted) (emphasis added); see also id. at 179 ("plaintiffs must also set forth an explanation as to why the statement or omission complained of was false or misleading"). At another point in the opinion, the Fifth Circuit states a "how" standard: "`who, what, when, where, and how' [are] required by Rule 9(b)." Id. (citing Melder v. Morris, 27 F.3d 1097, 1100 n. 5 (5th Cir.1994)). Finally, the court stated a narrower, yet logically consistent, version of the rule: "[d]irectly put, the who, what, when, and where must be laid out before access to the discovery process is granted." Id. at 178; see also Hart v. Bayer Corp., 199 F.3d at 248 n. 6.
Eight courts of appeals have adopted standards that require the pleading of a fifth element of the fraud.[3] Three other *512 courts of appeals have announced different standards.[4] The different formulations[5] of this fifth element of the Rule 9(b) standard reflect the difficulty in articulating criteria that identify those allegations that describe a fraud, so as to permit discovery to proceed.
Like the majority of courts of appeals, the Fifth Circuit has consistently applied the Rule 9(b) standard to require a fifth element. "[W]hat [that person] obtained thereby," Tuchman at 1068, "why the statement or omission complained of was false or misleading," Williams, at 179, and the "how required by Rule 9(b)," id., *513 are all variants of the same rule: in cases in which the mechanism or basis of the fraud is not otherwise apparent from the face of the complaint, the plaintiff must explain how the fraud worked. In cases in which a fifth element is not expressly included in the stated standard, that element was not relevant to the outcome of the appeal. See, e.g., Hart v. Bayer Corp., 199 F.3d at 248 n. 6. The amended complaints must be measured against all five elements of the Rule 9(b) standard.

B. The Rule 12(b)(6) Standard
Defendants have also moved to dismiss under Rule 12(b)(6), seeking dismissal for failure to state a claim upon which relief can be granted. A claim may not be dismissed under Rule 12(b)(6) "unless it appears certain that the plaintiff cannot prove any set of facts in support of her claim which would entitle her to relief." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Piotrowski v. City of Houston, 51 F.3d 512, 514 (5th Cir.1995). In deciding a Rule 12(b)(6) motion, the factual allegations of the complaint must be accepted as true, see Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and the complaint construed favorably to the pleader. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).
The court may consider the facts presented in exhibits to the complaint, as well as the factual allegations of the complaint itself. See Caine v. Hardy, 943 F.2d 1406, 1411 n. 5 (5th Cir.1991); Zinermon v. Burch, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); see also FED. R. CIV. PROC. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). "The court will not accept as true allegations that are contradicted ... by other allegations or by exhibits attached to or incorporated in the pleading." 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1363. The Seventh Circuit has held that
[a] plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff failed to do so. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.
Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir.1993); see also Sheppard v. Texas Dep't of Transp., 158 F.R.D. 592, 597 (E.D.Tex.1994) ("[A] court may rely upon a defendant's exhibit when it is referred to in the plaintiff's complaint and is central to plaintiff's claim"); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1327 (2d ed. 1990) ("[W]hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.").[6]
Although the court must accept as true "well-pleaded" factual allegations in the complaint, the court need not accept as true "conclusory" allegations or allegations of inferences that are contradicted by the *514 facts pleaded or set out in the exhibits attached to or incorporated in the pleading. See, e.g., Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir.1995) ("`conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss'") (quoting Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir.1993)).
The government and the defendants refer to several documents as relevant to the court's consideration of the motions to dismiss. The government has attached a "Progress Payment Request Chronology for Horizontal Well Drilling Work" to its second amended complaint. (Docket Entry No. 95, Att. A). In the second amended complaint, the government also cites or quotes excerpts from the contract between ECE and CH & A; a project summary report dated February 24, 1993 and written by David Rendini of CH & A; a letter dated July 20, 1993 from Rendini to Alton Watson, president of ECE; a letter dated June 16, 1993 from Watson to Rendini; a February 14, 1994 facsimile transmission from Pat Stout of NACC to Rendini; a February 14, 1994 facsimile transmission from Stout to Watson; the draft REA dated February 25, 1994; a cover letter to the February 25, 1994 draft REA from Watson to Rendini; a letter dated February 28, 1994 from Daniel Eaton of ECE to Rendini; the revised draft REA dated March 15, 1994; a letter dated March 17, 1994 from Watson to Wilkins, and copied to Don Sparkman of NACC and Rendini; CH & A's March 16, 1994 claim including the REA and submitted to NACC; the certification of the REA signed by Alton Watson, the president of ECE, and dated April 4, 1994; the certification of CH & A's March 16, 1994 claim including the REA, signed by Wilkins and dated April 6, 1994; NACC's certification of the REA, signed by Sparkman and dated May 11, 1994; and the REA received by the Corps on May 16, 1994. (Docket Entry No. 95).
CH & A has attached the contract between CH & A and ECE (Docket Entry No. 58, Ex. A), one set of excerpts from the draft REA dated February 25, 1994 (Docket Entry No. 106, Ex. 1); excerpts from the submitted REA dated March 15, 1994 (Id., Ex. 2; Docket Entry No. 108, Ex. C); CH & A's requests for progress payments for the work performed by ECE (Docket Entry No. 108, Ex. A); and another set of excerpts from the draft REA dated February 25, 1994 (Id., Ex. B).
Weatherford has attached a letter dated October 16, 1992 from David May of ECE to Bayani Abueg of NACC (Docket Entry No. 112, Ex. 13); the October 26, 1992 contract between CH & A and ECE (Id., Ex. 14); an invoice dated September 30, 1992 from ECE to NACC (Id., Ex. 15); and the certification of the REA signed by Alton Watson, the president of ECE, and dated April 4, 1994 (Id., Ex. 16).

C. The False Claims Act
"The test for False Claims Act liability ... is (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a `claim')."[7]United States ex rel. *515 Harrison v. Westinghouse Savannah River Co., 176 F.3d at 788, cited with approval in Russell, 193 F.3d at 308.
The courts generally require that the false statement or claim at issue be material. See, e.g., Harrison v. Westinghouse Savannah River Co., 176 F.3d at 785. "Materiality depends on `whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.' ... Materiality is a mixed question of law and fact.'" Id. (internal citations omitted).[8] The First Circuit *516 has also held that a false claim that is not material does not support liability under the post-1986 False Claims Act. See United States v. Data Translation, Inc., 984 F.2d 1256, 1267 (1st Cir.1992).
The Court of Federal Claims has held that "the FCA covers only those false statements that are material." Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 55 (Fed.Cl.1993). See also United States v. Intervest Corp., 67 F.Supp.2d 637, 646 (S.D.Miss.1999) ("the False Claim Act imposes a materiality requirement"); United States ex rel. Walle v. Martin Marietta Corp., 1997 WL 4566 at *2 (E.D.La.1997) (unpublished decision) ("there is a requirement that the false claim be a material misrepresentation"); United States v. Job Resources for the Disabled, 2000 WL 562444 at *2 n. 9 (N.D.Ill. May 9, 2000) (materiality determination "particularly appropriate when considering a lie of omission") (slip copy); United States ex rel. Lamers v. City of Green Bay, 998 F.Supp. 971, 991 (E.D.Wis. 1998) (same), aff'd, 168 F.3d 1013 (7th Cir.1999); United States ex rel. Durcholz v. FKW Inc., 997 F.Supp. 1159, 1167 (S.D.Ind.1998), aff'd, 189 F.3d 542 (7th Cir. 1999); Luckey v. Baxter Healthcare Corp., 2 F.Supp.2d 1034, 1046 (N.D.Ill.1998). But see United States ex rel. Roby v. Boeing Co., 184 F.R.D. 107 (S.D.Ohio 1998) (holding without explanation that under the Wells framework, there is no materiality requirement under the False Claims Act).
Although the courts generally require materiality, the Supreme Court and the Fifth Circuit have rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim. See Rex Trailer Co. v. United States, 350 U.S. 148, 152, 76 S.Ct. *517 219, 100 L.Ed. 149 (1956) ("there is no requirement, statutory or judicial, that specific damages be shown"). The Fifth Circuit has specifically held that actual damages need not be shown. In United States v. Miller, 645 F.2d 473 (5th Cir. Unit A May 1981), the court held that the dual remedies of civil penalty and actual damages provided in the False Claim Act indicate that the government need not show actual damages. See id., 645 F.2d at 476 n. 4. The court held in United States v. Aerodex, 469 F.2d 1003 (5th Cir.1972), decided under the former version of the Act[9] and its higher intent standard, that "[t]he mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the government agency." Id., 469 F.2d at 1007. See also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 20 F.Supp.2d 1017, 1047 (S.D.Tex.1998) ("a pecuniary injury to the public fisc is no longer required for an actionable claim under the FCA") (citations omitted), on remand from United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899 (5th Cir. 1997); United States v. Hughes, 585 F.2d 284, 286 n. 1 (7th Cir.1978) ("A false claim is actionable under the Act even though the United States has suffered no measurable damages from the claim.").

D. Common Law Fraud
The government also raises a claim for common law fraud as to all defendants. (Docket Entry No. 95, ¶¶ 128-32). CH & A raises, but does not argue, the issue of whether Texas law, Oklahoma law, or federal common law applies to the government's common law fraud claim. (Docket Entry Nos. 58, p. 15 n. 6; 108, p. 27 n. 20). The government does not address the issue of which law governs. "Normally, a federal court may fashion federal common-law rules only upon a specific showing that the use of state law will create a significant conflict with, or threat to, some federal policy or interest." Atherton v. FDIC, 519 U.S. 213, 214, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) (citing O'Melveny & Myers v. FDIC, 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994)). No party in this case has attempted to make such a showing.
In this case, there is no substantive conflict between Texas law and Oklahoma law. The Texas Supreme Court has held that "[a] fraud cause of action requires `a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.'" Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47-48 (Tex.1998) (citing Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex.1994); DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex.1990)). The Oklahoma Supreme Court has held that to show fraud, a plaintiff "must prove a) [the defendant] made a material representation; b) that the representation was false; c) [the defendant] knew it was false or made it recklessly, without regard for its truth; d) [the defendant] made it with the intention that [the plaintiff] act upon it; and e) injury was suffered by [the plaintiff] as a result." McCain v. Combined Communications Corp., 975 P.2d 865, 867 (Okla.1998) (citing 76 O.S.1991 § 3)). The elements of fraud in each jurisdiction are not materially different, would not result in different outcomes in this case, and do not necessitate a conflict-of-laws analysis.
The government's and the relator's allegations, and the exhibits they have attached and incorporated, must be examined in light of the applicable legal standards.

IV. The Padded Waste Claim
Defendants ECE and CH & A assert that the government's allegations as *518 to padded waste costs are both deficiently pleaded under Rule 9(b) and inadequate under Rule 12(b)(6). Defendants argue that the government has collapsed, or confused, the bid and contract prices for drilling wells and removing wastes, on the one hand, and, on the other hand, the underlying costs for performing such work. The bid, the contract, and the requests for progress payments are all stated in terms of price, with no reference to, or representations about, underlying costs. Defendants assert that the government has failed to allege any misrepresentation or false statement as to the cost basis for the price that ECE bid and contracted to receive for its work. Defendants also assert that there is no allegation of any duty on the part of ECE to disclose the cost components of the prices bid, contracted, or invoiced. Finally, defendants point to the language of the bid document, the contract, and the progress payment requests attached as exhibits to the complaint, emphasizing the absence of any representation about the costs contained in those documents.
The government's claim with respect to padded waste costs is a fraud-in-the-inducement claim. In such cases, "courts, including the Supreme Court, [have] found False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." Westinghouse Savannah, 176 F.3d at 787. Courts have imposed such liability in a variety of contexts. See, e.g., United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (finding contractors liable under the False Claims Act for claims submitted under government contacts which defendants obtained through collusive bidding); United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir.1991) (relator stated claim where county water agency and Army Corps of Engineers employee conspired to illegally lower the agency's contractual repayment obligations); United States v. General Dynamics Corp., 19 F.3d 770 (2d Cir.1994) (defendant held liable for submitting inflated cost estimates in subcontract submitted for approval to government).
In this type of fraud-in-the-inducement case, although the work contracted for is actually performed to specification at the agreed price, liability attaches under the False Claims Act because of fraud surrounding representations made to obtain a contract or to obtain payment under a contract. The courts have, however, distinguished between fraudulent statements about pricing or costs made in the bidding and invoicing process, as to which False Claims Act liability can attach, and omissions made without an obligation to disclose, on which liability cannot rest. See, e.g., United States ex rel. Berge v. Board of Trustees of Univ. of Ala., 104 F.3d 1453 (4th Cir.1997).
The government argues that it alleged that "CH & A and ECE/Weatherford were obligated to present to NACC a cost and pricing breakdown of their bid proposal for modification 9 for drilling the horizontal wells. This obligation was created by contract." (Docket Entry No. 119, Memorandum of Points and Authorities in Support of the Government's Opposition to Defendant's Motions to Dismiss the Government's Second Amended Complaint, p. 8). The government cites ¶ 17 of the Second Amended Complaint as the source of this allegation. Paragraph 17, as defendants correctly note, merely alleges that CH & A awarded the contract for the horizontal well drilling "to ECE as the lowest responsive bidder in a competitive bidding process required by the Corps." There is no allegation that either ECE or CH & A had a contractual obligation to present NACC a cost breakdown or a more detailed pricing breakdown. The government does not allege or argue another source of the alleged duty to disclose such information.
The government also points to the allegation that the Corps "reasonably assumed *519 that ECE's final bid proposal for the drilling costs did not include costs for storing, hauling, and disposal of drilling wastes." (Docket Entry No. 95, Second Amended Complaint, ¶ 22). The government alleges that the Corps relied on "representations of agents and representatives of CH & A and ECE, including but not limited to Bayani Abueg and David May, that were made in the bid proposals and in conversations with the Corps ACO, ... held between September 1992 and October 1992 ...." (Second Amended Complaint, ¶ 21). However, these allegations lack specific reference to a failure to provide information required to be disclosed, or false information, as required under Rule 9(b).
The government argues that paragraph 20 of the Second Amended Complaint provides the specificity needed. In paragraph 20, the government alleges that "[t]he bid proposals submitted by CH & A and ECE/Weatherford broke down the price for performing the contract modification work into two distinct portions: drilling and waste removal costs.... The drilling portion of the bid proposal was represented to the contracting officer by Bayani Abueg of CH & A and David May of ECE/Weatherford as being priced at $1.295 million.... The waste removal costs were represented by Messrs. Abueg and May as being estimated at $215,000." In paragraph 20, the government alleges that May and Abueg wrote the October 16, 1992 final bid proposal, which ECE submitted to CH & A, which submitted it for review to the Corps through NACC. However, the October 16, 1992 final bid proposal contains no representation about the cost components of the bid. To the contrary, the October 16, 1992 final bid proposal confirmed a total project price for drilling the five wellbores at the Tinker Air Force Base, "excluding waste disposal," of $1,295,000; a price of $215,000 to "store, haul and dispose of the drilling wastes" up to stated quantities; and a to-be-negotiated price at a unit (cubic yard of solid waste and gallon of liquid waste) rate for amounts of waste that exceeded those quantities.
Contrary to the government's argument, ECE's bid proposal did not break down ECE's proposed price into drilling costs and waste removal costs. In the bid proposal, ECE quoted fixed prices for "Well Materials," "Mobilization/Demobilization," and "to Drill, Complete and Develop," for a "Total Project Excluding Waste Disposal" price of $1,295,000. (Docket Entry No. 112, Ex. 13). There are price breakdowns in the letter, but nowhere in the letter does ECE disclose its costs to buy any of the materials or perform any of the tasks bid. The government makes no allegation that the contract or a statute or regulation required a cost breakdown.
The Subcontract Agreement between ECE and CH & A contained the same prices quoted in the final bid. (Docket Entry No. 58, Ex. A). The Subcontract Agreement provided that the "Contract Amount" of $1,295,000 was to be paid for performance of the following tasks: "Drill, Install, and Develop Five Horizontal Extraction Wells; Install Pump Systems; Manage Wastes." (Id., p. 19). The contract provided that in addition to the Contract Amount, "[a]ctual disposal of wastes is to be paid per the unit prices shown in item 36.C." (Id.). The contract contains no representation as to ECE's actual or expected costs of performing the work.
The government alleges that ECE and CH & A overstated the $1,295,000 price for all costs excluding waste removal in the bid and in the Subcontract Agreement by including in that amount $280,000 in "costs" that ECE expected to incur for "waste removal." The government asserts that ECE's "true" or "accurate" price was $1,015,000; the price that ECE bid and CH & A contracted for less a "fraudulently inflated" $280,000 in "waste removal costs." The government alleges that ECE and CH & A continued the misrepresentation by billing the government the agreed upon prices, based upon the percentage of the work completed at the time of each *520 invoice. However, the government alleges no facts to support its allegation of a lower "true" or "accurate" price, given the absence of any cost information or pricing breakdown in the documents or in any other specific representation alleged, and given the absence of a requirement to provide such information.
In short, although some of the allegations as to the October 16, 1992 bid, the October 26, 1992 Subcontract Agreement, and the progress payments attached to the complaint are specific, those allegations do not specify what, why, or how the statements in those documents constitute false or fraudulent claims.
The government argues that it need not allege the "why" of the fraud, because there are many reasons why a defendant might commit fraud. (Docket Entry No. 119, p. 9). The government concedes that it must plead the "how" of the fraud and alleges that it has so pleaded in paragraphs 22 and 23 of the second amended complaint. (Id., pp. 9-10). Paragraphs 22 and 23 of the second amended complaint read:
22. Unbeknownst to the Corps, however, and without the Corps' agreement or approval, ECE's final bid of $1,295,000 for drilling operations contained a sum of $280,000 that was not related to drilling costs, but was, rather, a "padded amount" for waste removal costs.
23. ECE included the "padded amount" for waste removal costs in the drilling portion of its contract bid at CH & A's request. David May, ECE's president at the time ECE was bidding on the horizontal well project, was verbally instructed by Bayani Abueg, CH & A's onsite project manager, to pad the drilling price with monies for waste handling and disposal costs. The excess costs amounted to $280,000.
(Docket Entry No. 95, p. 8).
The "why" aspect of a False Claims Act claim does not require pleading the reasons a defendant committed the alleged fraud, but instead the reasons the conduct complained of is fraudulent. See Williams, 112 F.3d at 179 ("why the statement or omission complained of was false or misleading"); Yourish v. California Amplifier, 191 F.3d 983, 993 (9th Cir.1999) (plaintiff must explain "why the statement or omission complained of was false or misleading"); Olsen v. Pratt & Whitney Aircraft, a Div. of United Techs. Corp., 136 F.3d 273, 275 (2d Cir.1998) (complaint must "explain why the statements ... are fraudulent"). The "how" aspect of the fraud pleading must explain how the facts alleged, assumed as true, resulted in a fraud on the government. Under either formulation, the government must plead facts that show how including $280,000 in waste removal costs in a total price bid, that the Corps accepted as the lowest responsive bid, fraudulently induced the Corps to approve the contract between CH & A and ECE.
The government alleges that David May, ECE's president at the time of the bid, was "verbally instructed by Bayani Abueg, CH & A's on-site project manager, to pad the bid for the drilling price with monies for waste handling and disposal costs," and that "[t]he excess costs amounted to $280,000." (Docket Entry No. 95, Second Amended Complaint, ¶ 23, p. 8). The government also alleges that on October 31, 1992, after ECE submitted its bid and after it signed the Subcontract Agreement, ECE contracted with a waste disposal contractor, January Transport, to perform waste disposal services for ECE. January Transport charged ECE higher unit rates for disposing of solid and liquid hazard wastes than ECE charged in its Subcontract Agreement with CH & A. Based on the rates ECE agreed to pay January Transport for disposing of the waste quantity estimated in the ECE Subcontract Agreement with CH & A, the government asserts that January Transport would potentially charge ECE $495,000. The government *521 asserts that the January Transport contract "on its face, would exceed [ECE's] final bid proposal for waste handling and removal by $280,000, which was the exact amount by which ECE padded its bid proposal for drilling costs that had been submitted to the Corps." (Second Amended Complaint, ¶ 28, p. 10). The government concludes that ECE made up this shortfall by padding its bid and submitting payment claims that included in the total price for drilling work the $280,000 that "should have been" classified as part of waste handling and removal, not drilling.
The government includes in its complaint the fact that the January Transport/ECE subcontract had a $400,000 ceiling. (Docket Entry No. 95, Second Amended Complaint, ¶ 26, p. 9). However, in the complaint, the government apparently calculated the shortfall between ECE's obligation to pay January Transport and CH & A's obligation to pay ECE under the CH & A Subcontract Agreement without regard to this ceiling. With this ceiling included, the difference between the payment to ECE and what ECE had to pay January Transport is $185,000, not $280,000. The government does not explain how the ceiling affects the calculation. However, if the ceiling applies, the inference the government seeks to draw from the identity between the amount ECE had to pay and the amount of "padding" in the bill ECE submitted to the Corps does not appear to be supported by the facts alleged.
Even if the facts the government alleges are assumed to be true, the government's allegations remain deficient not only under Rule 9(b), but also under Rule 12(b)(6). The government received a fixed price bid for drilling, a fixed price bid for a certain amount of waste disposal, and a bid for unit price rates for the disposal of waste quantities above the stated amounts. The government alleges that ECE should have charged $280,000 less for the drilling and waste management work because the $1,295,000 fixed price bid agreed to, invoiced, and paid included some costs for waste handling. The government does not allege that ECE misstated its per unit charges for waste removal in any of the invoices. Instead, the government alleges that ECE should have told the government that it could have performed the work of drilling and waste management less expensively and could have charged the government a lower price. However, "the mere fact that an activity may be accomplished less expensively in a fixedprice contract falls measurably short of fraud under the False Claims Act." Sterling Millwrights, Inc. v. United States, 26 Cl.Ct. 49, 101 (1992).
Given the fixed price nature of the bid and contract, and the absence of any required or actual disclosure of cost information, the "padding" of waste costs claim lacks materiality as a matter of law. This result is supported by two different, but not incompatible, materiality standards used in the cases. One is the standard the Fourth Circuit applied in Westinghouse Savannah. "Materiality depends on `whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action.'" Westinghouse Savannah, 176 F.3d at 785 (quoting United States ex rel. Berge v. Board of Trustees of Univ. of Ala., 104 F.3d 1453, 1459 (4th Cir.1997)). The other is the Restatement standard the Supreme Court cited in Neder:
The Restatement instructs that a matter is material if:
(a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
(b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it. *522 Neder, 527 U.S. at 22 n. 5, 119 S.Ct. 1827 (citing RESTATEMENT (SECOND) OF TORTS § 538 (1976)). In the context of the False Claims Act, a court applying the Restatement materiality standard does not compare the action the agency actually took to an action a "reasonable agency" might have taken had the agency known of the falsity of the statement or the fraudulent nature of the defendant's conduct. Rather, the court compares the actions of a reasonable agency confronted with true statements with the actions of a reasonable agency confronted with the allegedly false statements and determines if there is a difference.[10]
The government does not allege facts that show why the statements it challenges would tend to influence the Corps' action or be capable of influencing the Corps' action. A court might find the allegations as to padded costs material if the padding alleged was in the opposite direction; that is, if the contractors were alleged to have lowered the fixed, drilling price part of the contract and increased the per unit rate waste removal price in order to submit an artificially low bid. In such a situation, the government could allege facts showing that a contractor was submitting a fraudulent bid by making the fixed price portion of the bid appear to be lower than it actually was. However, in this case, the government alleges that the contractor improperly increased the fixed price portion of the bid and contract, still had the lowest bid, and did not increase the per unit rate charges. The facts alleged, assumed as true, do not show a material misrepresentation.
The government argues that but for the alleged false statements, the Corps would not have approved the contract. (Docket Entry No. 95, Government's Complaint, ¶ 36). The materiality requirement must rest on more than an allegation of but-for causation. The government must instead allege that a reasonable agency would not have approved the contract had the true facts been stated in the bid. The cases in which courts find a False Claims Act cause of action for statements made during the contracting process to induce the government to accept a bid or award a contract involve facts conspicuously different from those pleaded in this case. "In these [fraud-in-the-inducement] cases, courts, including the Supreme Court, found False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." Westinghouse Savannah, 176 F.3d at 787. In United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), the Supreme Court held that "[t]he initial fraudulent action [of collusive bidding] and every step thereafter taken, pressed ever to the ultimate goal  payment of government money to persons who had caused it to be defrauded." Id. at 543-44, 63 S.Ct. 379. The fraud in Marcus was collusive bidding meant to drive up the eventual claims the bidders made to the government. In Hagood, the Ninth Circuit held that the relator had stated a claim under the False Claims Act when he alleged that the government *523 had entered into a contract based on false information that substantially lowered costs to the contractor. See Hagood, 929 F.2d at 1420. In these examples of fraud-in-the-inducement cases, the false statements were material because a reasonable agency would have acted differently in the absence of the fraud.[11] No such facts are pleaded in this case.
The government also fails to show materiality on the basis of a false statement because the facts pleaded do not allege any duty to disclose. "There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information." Berge, 104 F.3d at 1461 (citing United States ex rel. Milam v. Regents of the Univ. of Calif., 912 F.Supp. 868, 883 (D.Md.1995)); see also United States v. Board of Educ. of the City of Union City, 697 F.Supp. 167 n. 9 (D.N.J.1988) (holding that False Claims Act plaintiff must show that allegedly omitted "documents were required, or that their absence renders a claim to be false.").
This court dismisses Counts IV and V as to CH & A, ECE, and/or Weatherford, and dismisses the remaining counts to the extent they are based upon overstated costs for waste removal. (Docket Entry No. 95, Government's Second Amended Complaint, ¶¶ 100 and 101).
The government has amended its complaint twice, but has failed to muster padded waste costs allegations that withstand Rule 9(b) and Rule 12(b)(6). This court DENIES as futile leave to amend the complaint to include such allegations.

V. The Section 3729(a)(1)-(2) Claims Based on the REA
False certification cases arise only if compliance with the statutes or regulations was a prerequisite to gaining a benefit, and the defendant affirmatively certified such compliance: "where the government has conditioned payment of a claim upon a claimant's certification of compliance with ... a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation."
Westinghouse Savannah, 176 F.3d at 787 (quoting United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir.1997)). The relator's and the government's claims relating to the REA and, in part, to the padded waste claim, are false certification claims. These claims rest primarily on the certifications that accompanied ECE's certification of its claim and the other defendants' certification of the claims they "passed through" in the REA. The government claims that all three defendants falsely certified both the accuracy of the information in the REA and the good faith submission of the REA.
The government's false certification claims in connection with the REA are pleaded with the detailed particularity Rule 9(b) requires. The "what" are the statements in the REA certifying that the defendants submitted the REA in good faith and that the supporting data was accurate and complete; the "when" is the date the Corps received the REA; the "who" are the officers of the defendants who planned the contents of the REA and signed the certifications. The "how"  the mechanism of the fraud  is the fact that such a certification was a condition for the government to consider payment under the REA. The government has sufficiently "set forth `the who, what, when, and where [and how]'" thereby "provid[ing] defendants *524 with adequate notice of the nature and grounds of the claim." Hart v. Bayer Corp., 199 F.3d at 248 n. 6.
The critical issue raised in the Rule 12(b)(6) motions is whether the allegations as to defendants' statements and omissions state False Claims Act claims or merely allege good faith disputes as to contractual liability. The government and relator allege that the differences among the draft REAs reflect culpable decisions by the defendants. These decisions include minimizing their accusations of fault as to each other and instead emphasizing the government's role in the delays and cost overruns; omitting information previously included in the draft REAs inconsistent with the position that the subsurface conditions at the site differed from the conditions shown in the government contract bid logs; and asserting that the horizontal well logs that the government did not include in the bid package gave the government superior knowledge of "vital" information about subsurface conditions at the drilling site. The defendants assert that the government overstates the differences between the draft REAs and the final version submitted to the government and mistakenly characterizes a litigant's position as to a disputed claim as a fraudulent or false claim.
If the complaint alleges a set of facts that support a claim that would entitle the government to relief, the court must deny the motion to dismiss. See Conley v. Gibson, 355 U.S. at 45-46, 78 S.Ct. 99. To state a claim based on false certification[12] of the REA, the government must allege facts that, if proven, would show that: (1) the defendants falsely certified that they submitted the REA in good faith; (2) with the requisite scienter; (3) the false certification was material; and (4) the REA involved a claim. See Westinghouse, 176 F.3d at 788. The scienter required is the statutorily defined "knowing." 31 U.S.C. § 3729(b). "Knowledge is established by proving that the defendant (1) had actual knowledge that it submitted a false or fraudulent claim for payment or approval, (2) acted in deliberate ignorance of the truth or falsity of its claim, or (3) acted in reckless disregard of the truth or falsity of its false claim." United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 464 (9th Cir.1999) (citing 31 U.S.C. § 3729(b); Wang v. FMC Corp., 975 F.2d 1412, 1420 (9th Cir.1992)).
The government has alleged that the defendants: (1) deliberately described as "government logs" the well logs that CH & A gave ECE before bidding; (2) intentionally omitted information showing that the vertical well logs that the government did include in the bid package, but that CH & A and NACC did not give to ECE, accurately represented the subsurface conditions; (3) intentionally omitted information showing that the vertical well logs that CH & A gave ECE before bidding did not accurately represent the subsurface conditions; (4) falsely asserted that the government withheld disclosure of horizontal well log information before ECE began to drill; and (5) recklessly asserted that the horizontal well log information was "vital" and "material" to understanding the subsurface conditions, without ever examining these logs or knowing what information they contained. These allegations may in the end be "grist for the summary judgment mill," but they assert facts that, assumed as true, state a claim under section 3729. United States ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 208 (E.D.Tex.1998) (holding that the plaintiffs did not have to describe every detail of the alleged fraudulent scheme, but rather merely enough to put defendants on notice).
This court DENIES defendants' motions to dismiss the government's section 3729(a)(1)-(a)(3) claims based on submission of the REA.

*525 VI. The Government's Conspiracy Claim
Section 3729(a)(3) provides that liability under the False Claims Act shall attach to any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3).[13] General civil conspiracy principles apply to conspiracy claims under the False Claims Act. See United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 546 n. 3 (7th Cir.1999). To allege civil conspiracy, the government and the relator must plead "that the defendants ... had an agreement to commit an illegal act which resulted in the plaintiff's injury." Thomas v. City of New Orleans, 687 F.2d 80, 83 (5th Cir.1982) (quoting Crowe v. Lucas, 595 F.2d 985, 993 (5th Cir.1979)). The injury in this case need not be specific damages because the "Government's recovery here is comparable to the recovery under liquidated-damage provisions which fix compensation for anticipated loss." Rex Trailer, 350 U.S. at 153, 76 S.Ct. 219.[14]
In this case, the "illegal act" is the alleged knowing submission of a false or *526 fraudulent claim to the Corps. For the reasons previously set out, the allegations of a false or fraudulent claim, to the extent they rely on the submission of the REA, are sufficiently pleaded. The allegations based on padded waste costs are insufficiently pleaded and are DISMISSED.
The government has also sufficiently alleged circumstances that could lead to a reasonable inference that there was an agreement among defendants ECE, NACC, and CH & A to defraud the government by submitting a false or fraudulent claim. The alleged March 8, 1994 meeting among Reitmeyer and Sparkman of NACC, Rendini and Wilkins of CH & A, and Eaton of ECE; the changes in the REA drafts; the statements as to the inaccuracy of the Corps' vertical well drilling logs; the omission of statements critical of CH & A's logs and CH & A's failure to provide ECE with the Corps' bid package logs; and the alleged absence of any information as to the contents of the horizontal drilling logs are circumstantial evidence of an agreement to defraud between ECE, NACC, and CH & A. (Docket Entry No. 95, ¶¶ 48-50). The government has alleged injury resulting from the conspiracy; like sections 3729(a)(1) and 3729(a)(2), section 3729(a)(3) does not require actual damages as a necessary element of the claim. See Miller, 645 F.2d at 476 n. 4; Westinghouse Savannah, 176 F.3d at 785 n. 7.
This court DENIES defendants' motions to dismiss Count VI, to the extent the claims are based on the submission of the REA, and GRANTS defendants' motions to dismiss Count VI, to the extent the claims are based on padded waste costs.

VII. The Challenges to the Relator's Complaint

A. The Rule 9(b) Challenge to the Relator's Complaint
The defendants have moved to dismiss Wilkins's first amended complaint (Docket Entry No. 96) on the alternative bases of Rule 9(b) and Rule 12(b)(6). (Docket Entry Nos. 105 and 110). Wilkins has responded. (Docket Entry No. 125).
Wilkins's first amended complaint does not plead fraud with particularity. Specifically, Wilkins does not plead the "what" and "how" elements of Rule 9(b) with particularity. Nowhere in Wilkins's complaint does he indicate what NACC and CH & A represented to the government. He does allege that NACC and CH & A passed through and certified ECE's claim. (Docket Entry No. 96, ¶ 36). However, he does not indicate "what" the defendants' respective certifications entailed. Nor does he describe "how" passing through the claims might create liability in the defendants. See (id.).
As for Wilkins's claims against ECE, Wilkins has also failed to plead the "what" *527 and "how" of his fraud claim with particularity. In paragraph 30 of the amended complaint, Wilkins claims that "[u]nder Reitmeyer's direction, ECE based its REA on different site conditions (page 5), [sic] undisclosed information (page 8) due to government actions and its boring logs." (Id., ¶ 30). This allegation, even taken in the context of the narrative of Wilkins's complaint, does not plead fraud with particularity. Although there is a "who" (Reitmeyer), a "what" (ECE's REA), and a "how" (misrepresentations about different site conditions and undisclosed information), Wilkins fails to connect these elements to meet the Rule 9(b) requirements. Most importantly, Wilkins fails to allege with particularity what the defendants claimed in the REA actually submitted to the Corps. Wilkins refers to and quotes from the various draft REAs, but does not allege what the defendants submitted.
Wilkins comes closest to meeting the pleading requirements in paragraph 42 of the amended complaint. That paragraph makes two claims:
 despite ECE's position that the COE logs adequately represented site conditions and its belief that CH & A was responsible for the majority of ECE's drilling problems, and despite CH & A's position that ECE was responsible for its own drilling problems, and despite NACC's knowledge of these facts, the certified claim submitted to the Corps ... contended that the United States was responsible for drilling problems as a result of an alleged differing site condition.
 "the pass-through claims ... did not contain the AMENCO report .... The AMENCO report was, at NACC's urging, removed from ECE's claim, in order to misrepresent factual conditions to the government in NACC's certified claim."
(Id., ¶ 42).
Even in these paragraphs, the "what" of the description of the claim in the REA is imprecise at best. Wilkins does not quote the specific "conten[tions]" that he argues are misrepresentations. The "how" is also missing, because Wilkins does not explain why it is fraudulent for a contractor to submit a claim asserting that the government was responsible for cost overruns when a defendant believes that it or another contractor also has some undefined amount of responsibility.
As for the omission of the AMENCO report from the REA, Wilkins has not pleaded "how" the omission of the AMENCO report makes the REA false. He has not pleaded that the defendants had a duty to include information in their possession that might increase the likelihood that the government would reject all or part of the REA. The complaint does not allege facts showing "how" changing one of the exhibits after Wilkins had certified the pass-through claim constituted fraudulent behavior.
This court "should not [dismiss a complaint for failure to plead with particularity] without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." Hart v. Bayer Corp., 199 F.3d at 248 n. 6. Wilkins has amended his complaint once. This court GRANTS the motions to dismiss the relator's first amended complaint, with leave to amend within twenty days of the date this order is entered.

B. The Failure to Serve Process on Weatherford
Weatherford argues that Wilkins did not properly serve it with process. (Docket Entry No. 114, p. 3). Wilkins responds that he served process on Weatherford's wholly-owned subsidiary, ECE, and that Wilkins served his first amended complaint on Weatherford's counsel. (Docket Entry No. 126, pp. 4-5).
"The law is well settled that service of process on a wholly-owned subsidiary does not constitute service of process on a parent corporation where separate *528 corporate identities are maintained." United States ex rel. Vallejo v. Investronica, Inc. 2 F.Supp.2d 330, 335 (W.D.N.Y. 1998) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Sansui Elecs. Corp. v. American S. Ins. Co., 1992 WL 77591 (S.D.N.Y.1992); Fleming v. Yamaha Motor Corp., 774 F.Supp. 992, 994 (W.D.Va. 1991)). In this case, Wilkins has not shown that Weatherford and ECE failed to maintain separate corporate identities.
"[S]ervice of process is not effectual on an attorney solely by reason of his capacity as attorney. Rule 4(d)(1) allows service on an agent only if `authorized by appointment or by law to receive service of process.'" Ransom v. Brennan, 437 F.2d 513, 518-19 (5th Cir.1971) (citing 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1097; Scarborough v. Bradley, 256 S.W. 349 (Tex.Civ.App.  Waco 1923)). Wilkins's service of the first amended complaint on counsel for Weatherford is not effective for purposes of Rule 4; Wilkins's complaint against Weatherford must be DISMISSED without prejudice for failure to effect service of process. See FED. R. CIV. P. 4(m).

C. The Rule 12(b)(6) Challenge to the Claims against GAB
GAB argues that the claims against it should be dismissed because Wilkins has not adequately pleaded, under Rule 9(b) or Rule 12(b)(6), that GAB caused the submission of the REA to the government. GAB also disputes Wilkins's alter ego allegations as insufficient. (Docket Entry No. 106, pp. 15-25). In his memorandum in reply to GAB's motion to dismiss, Wilkins responds only that he has adequately pleaded that GAB was the alter ego of CH & A.[15] (Docket Entry No. 126 pp. 8-9).
Wilkins has not adequately alleged GAB's independent involvement in the REA submission. The only GAB involvement Wilkins alleges happened before the submission of the REA on May 16, 1994 is a telephone call he had with Peter Rescigno of GAB, in which Wilkins expressed his misgivings about the REA. (Docket Entry No. 96, Relator's First Amended Original Complaint, ¶ 34). This allegation is not enough to allow Wilkins's theory of direct liability on the part of GAB to survive either the Rule 9(b) challenge or the Rule 12(b)(6) challenge.
Wilkins also seeks to hold GAB liable under an alter ego theory.[16] Under Texas law, the alter ego doctrine "applies `when there is such unity between the parent corporation and its subsidiary that the separateness of the two corporations has ceased and holding only the subsidiary corporation liable would result in injustice.'" Gardemal v. Westin Hotel Co., 186 F.3d 588, 593 (5th Cir.1999) (quoting Harwood Tire-Arlington, Inc. v. Young, 963 S.W.2d 881, 885 (Tex.App.  Fort Worth 1998, writ dism'd by agr.)). In Alpine View Co. Ltd. v. Atlas Copco AB, 205 F.3d 208 (5th Cir.2000), the Fifth Circuit observed that there are "twelve factors to be used when assessing whether a subsidiary is the alter ego of its parent. However, we [have] also noted that the assessment is based on a consideration of totality of the circumstances." Id., 205 F.3d at 218. The twelve factors are:

*529 (1) the parent and the subsidiary have common stock ownership;
(2) the parent and the subsidiary have common directors or officers;
(3) the parent and the subsidiary have common business departments;
(4) the parent and the subsidiary file consolidated financial statements and tax returns;
(5) the parent finances the subsidiary;
(6) the parent caused the incorporation of the subsidiary;
(7) the subsidiary operates with grossly inadequate capital;
(8) the parent pays the salaries and other expenses of the subsidiary;
(9) the subsidiary receives no business except that given to it by the parent;
(10) the parent uses the subsidiaries property as its own;
(11) the daily operations of the two corporations are not kept separate; and
(12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.
Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc., 85 F.3d 201, 208-09 (5th Cir.1996).
In this case, Wilkins has alleged common stock ownership; common officers; common business departments; that GAB on occasion paid the salaries and other expenses of CH & A; and that some operations of the GAB and CH & A are not kept separate. (Docket Entry No. 96, ¶ 44). Wilkins also conclusorily asserts that CH & A "was operated as a mere tool or business conduit of GAB." Wilkins has not alleged that GAB and CH & A file consolidated financial statements and tax returns; that GAB caused the incorporation of CH & A; that CH & A operates with grossly inadequate capital; that CH & A receives no business except that given to it by GAB; that GAB uses CH & A's property as its own; or that CH & A does not observe basic corporate formalities.
If Wilkins's allegations sufficiently state an alter ego claim, then most subsidiaries would be considered the alter egos of their parents. Wilkins's complaint does not allege facts that, if true, would support liability based on an alter ego theory. See Alpine View, 205 F.3d at 219.
Because this court finds that Wilkins has not successfully articulated a claim against GAB based on CH & A's submission of the REA, this court GRANTS GAB's motion to dismiss Wilkins's claims against it, with leave to amend his complaint to include allegations of fact that would support an alter ego claim, within twenty days of the date this order is entered.

D. Weatherford's Motion to Dismiss the Relator's Complaint as Superseded by the Government's Intervention
Weatherford claims that the "law is clear that where the government has intervened in a qui tam action and filed an amended complaint, the government's complaint supersedes the relator's complaint as to all claims [the government] adopts, and the relator's claims have no continuing vitality." (Docket Entry No. 114, p. 4). Weatherford argues that, except for Wilkins's claims against GAB, Wilkins's amended complaint should be dismissed.
Section 3730(c)(1) of the False Claims Act provides that after government intervention, "[the relator] shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2)." Subsections (A), (B) and (C) of paragraph (2) set out methods by which the government may limit the relator's role. The sole method by which a defendant may limit the relator's role is provided for in section 3730(c)(2)(D): "Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the *530 participation by the person in the litigation."
In this case, Weatherford has not shown, or attempted to show, that Wilkins's participation in the litigation is for purposes of harassment, or that it would cause defendants an undue burden or unnecessary expense. Absent such a showing, the statute clearly contemplates unrestricted participation and full party status for the relator. In United States ex rel. Long v. SCS Bus. & Technical Inst., Inc., 173 F.3d 870 (D.C.Cir.1999), supplemented by United States ex rel. Long v. SCS Bus. & Technical Inst., Inc., 173 F.3d 890 (D.C.Cir.1999), cert. denied, ___ U.S. ___, 120 S.Ct. 2194, 147 L.Ed.2d 231 (2000), the court noted that
[w]hatever the degree of control the United States exercises, we think it is telling that, although there are some intimations to that effect, no court has actually held that the relator is not a party to the qui tam suit merely because of the United States' potential ability to control the prosecution of the suit.
The relator appears to remain a party whether or not the United States intervenes. In either situation, the relator's rights must be protected under the statute.
Id. at 885. See also Ragsdale v. Rubbermaid, Inc., 193 F.3d 1235, 1239 n. 7 (11th Cir.1999); United States ex rel. Roby v. Boeing Co., 995 F.Supp. 790, 796 (S.D.Ohio 1998) (denying defendant's motion to dismiss the relator and holding that the relator's separate pleadings and separate discovery did not harass or cause delay or burden to defendant).
In Vermont Agency of Natural Resources v. United States ex rel. Stevens, ___ U.S. ___, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), the Supreme Court rejected an agency theory like the one Weatherford urges and held that "a qui tam relator is, in effect, suing as a partial assignee of the United States." Id. at 1863 n. 4. Although the question of whether a relator's complaint is superseded by the government's complaint was not before the Court, nothing in the opinion suggests that the government and defendants can eliminate the relator's participation in the lawsuit except under the circumstances set forth in the statute.
Wilkins has ceded the "primary responsibility" in the action to the government, but is still a party to the action and will remain so until a party raises, and the court sustains, a section 3730(c)(2) objection. 31 U.S.C. § 3730(b)-(c).

VIII. The Common Law Fraud Claim
The government claims that the "[d]efendants made false, material representations to the United States about their understanding of the contract site conditions"; that the government reasonably relied on the material misrepresentations; and that the government suffered substantial damages as a result of its reliance. (Docket Entry No. 95, Government's Second Amended Complaint, ¶¶ 128-32). Defendants claim that the government has not pleaded fraud with particularity, pleaded reliance, or pleaded injury. (Docket Entry Nos. 108, pp. 26-29 and 112, pp. 23-24). CH & A also argues that the government's complaint is time-barred under 28 U.S.C. § 2415(b). (Docket Entry No. 108, p. 29).
Like the government's False Claims Act allegations, the government's fraud allegations based on the defendants' REA claim of superior government knowledge and differing site conditions pass Rule 9(b) muster.[17] The differences between the defendants' challenges to the False Claims Act claims and their challenges to the common law fraud claim are the common law fraud elements of reliance and injury.
*531 Defendants argue that the government did not, as a matter of law, rely on the alleged material misrepresentations because the government had to investigate the claims in the REA in any event. In support of their position that conducting an investigation cannot constitute reliance, defendants cite the unpublished opinion in First Lehigh Bank v. North River Insurance Co., Civ. A. No. 88-7746, 1989 WL 146654 (E.D.Pa.1989). In that case, the court held that funds an insurance company expended in investigating and defending a claim stemmed "from the opposite of reliance." Id. at *4. The court in First Lehigh also held that because investigation costs are a normal cost of doing business for insurance companies, those expenses may not be recovered in a fraud action. See id. Relying on this holding, defendants argue in this case that because the government contracting officer is required by the Federal Acquisition Regulation, 48 C.F.R. § 33.211(a)(1), to "[r]eview the facts pertinent to the claim" in a REA, the government's investigatory costs cannot be caused by its reliance on the alleged misrepresentations. Id.
In their argument, the defendants appear to focus on the wrong misrepresentation.[18] The government begins a statutorily required investigation based on the certification that the representations in the REA are made in good faith. Although the government bases its common law fraud claim in "Count VII" on alleged misrepresentations the defendants made about the defendants' "understanding of the contract site conditions" (Docket Entry No. 95, ¶ 129), the government also incorporated in Count VII its allegations elsewhere in the complaint that the defendants misrepresented that they submitted the REA in good faith. (Id., ¶ 128). This court "may not dismiss a complaint under Rule 12(b)(6) `unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Shipp v. McMahon, 199 F.3d 256, 260 (5th Cir.2000) (quoting Conley v. Gibson, 355 U.S. at 45-46, 78 S.Ct. 99). The government is under no obligation to begin a Federal Acquisition Regulation investigation of a REA absent a certification that the REA is submitted in good faith.
Defendants' argument that the government did not adequately plead reliance raises the issue of when the government ceased to rely on defendants' alleged misrepresentations. "Actual knowledge is inconsistent with the claim that the defrauded party has been deceived, and it negates the essential element of reliance upon the truth of the representation.... Only actual knowledge is sufficient to defeat a claim for fraud." Mayes v. Stewart, 11 S.W.3d 440, 451 (Tex.App.  Houston [14th Dist.] 2000, pet. requested) (citing Koral Indus., Inc. v. Security-Connecticut Life Ins. Co., 788 S.W.2d 136, 146 (Tex. App.-Dallas), writ denied). "It is not the rule that a person injured by the fraudulent and false representations of another is held to the exercise of diligence to suspect and discover the falsity of such statements. In the absence of knowledge to the contrary, he would have a right to rely and act upon such statements, and certainly the wrongdoer in such a case cannot be heard to complain that the other should have disbelieved his solemn statements." Koral Indus. v. Security-Connecticut Life Ins. *532 Co., 802 S.W.2d 650, 651 (Tex.1990) (per curiam) (quoting Western Cottage Piano & Organ Co. v. Anderson, 45 Tex.Civ.App. 513, 101 S.W. 1061, 1064 (1907, writ denied)). "`The test always is, to avoid the defense of fraud as to a material fact upon the score of waiver, the company must know the identical statement as made is untrue.'" Id. (quoting Dossett v. Franklin Life Ins. Co., 276 S.W. 1097, 1098 (Tex. Comm'n App.1925, judgm't adopted)).
Defendants submitted the REA with certifications of good faith on May 16, 1994. The government alleges facts that show that it ceased to rely on the defendants' certifications at some time after May 16, 1994 but before the date the government rejected the claim under the Contract Disputes Act. This court cannot dismiss, as a matter of law, the government's claim for investigative expenses in reliance on the defendants' certifications of good faith.
Defendants also claim that the government has not adequately pleaded that it suffered injury as a result of fraud. In Arthur Andersen & Co. v. Perry Equipment Corp., 945 S.W.2d 812 (Tex.1997), the Texas Supreme Court described the common law fraud damages standard:
At common law, actual damages are either "direct" or "consequential." Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and result from it.
Id. at 816 (citations omitted). "[I]nvestigative expense may be found to be proximately resulting from [a defendant's] alleged misrepresentations." Jackson v. Julian, 694 S.W.2d 434, 437 (Tex.App. Dallas 1985, no writ) (citing El Paso Dev. Co. v. Ravel, 339 S.W.2d 360, 364 (Tex.Civ. App.  El Paso 1960, writ ref'd n.r.e.)). These damages are properly seen as consequential damages under the scheme set forth in Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41 (Tex.1998): "consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable." Id., 960 S.W.2d at 49 n. 1 (citing Arthur Andersen, 945 S.W.2d at 817).
In this case, the government has alleged that it incurred investigative expenses in reliance on misrepresentations in the REA. The government alleges that these investigative costs were caused by the misrepresentations because the government was required by the Federal Acquisition Regulation to investigate the claims made in the REA and certified as submitted in good faith. The government has adequately alleged the injury element of a common law fraud claim.
Finally, CH & A's argument that 28 U.S.C. § 2415(b) operates as a time bar to the government's common law fraud claim is unpersuasive. "[U]nder Rule 15(c), an amendment to a complaint will relate back to the date of the original complaint if the claim asserted in the amended pleading arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Coastal Plains, Inc. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 216 (5th Cir. 1999) (quoting F.D.I.C. v. Conner, 20 F.3d 1376, 1385 (5th Cir.1994)) (alteration in original), cert. denied sub nom. Mims v. Browning Mfg., ___ U.S. ___, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000). In this case, the government clearly raised its common law fraud allegations in its original complaint upon intervention (Docket Entry No. 31, pp. 15-16), that was filed October 22, 1998, less than three years after the relator filed his complaint under seal on *533 December 11, 1995. Without deciding whether 28 U.S.C. § 2415(b) applies, or when the limitations period began, this court holds that the government has clearly stated a claim that survives CH & A's motion to dismiss on the basis of limitations.
This court DENIES the defendants' motions to dismiss Count VII, to the extent the claims are based on the submission of the REA, and GRANTS the defendants' motions to dismiss Count VII, to the extent the claims are based on the padded waste costs claims.

IX. The Contract Disputes Act Claim Against NACC
NACC moves under Rule 9(b) and Rule 12(b)(6) to dismiss the government's Contract Disputes Act claim. (Docket Entry No. 109, p. 2). NACC incorporates by reference the False Claims Act and common law fraud arguments in the Weatherford and CH & A motions to dismiss.[19]
The Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13, provides that:
If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim. Liability under this [section] shall be determined within six years of the commission of such misrepresentation of fact or fraud.
41 U.S.C. § 604. "To recover under the [Contract Disputes Act], the government is required to establish that the contractor made false or fraudulent statements in its submitted claim with an intent to deceive or mislead the government." Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1362 (Fed.Cir.1998). There are very few cases applying 41 U.S.C. § 604. NACC has not cited any cases that apply Rule 9(b) to claims brought under section 604. Absent relevant caselaw, any obvious similarity between the provisions of the False Claims Act and section 604, or any argument from NACC in support of its motion to dismiss, this court is extremely reluctant to make a dispositive ruling. This court DENIES NACC's motion to dismiss Count I.

X. Conclusion
The court GRANTS the motions filed by CH & A and Weatherford to dismiss the government's claims for violations of 31 U.S.C. § 3729(a)(1)-3729(a)(3) arising from the allegation of padded waste costs in the subcontract between ECE and CH & A and DENIES the motions filed by NACC, CH & A, and Weatherford to dismiss the government's claims for violations of31 U.S.C. § 3729(a)(1)-3729(a)(3) arising from submission of the Request for Equitable Adjustment.
The court DENIES the motion filed by NACC to dismiss the government's Contract Disputes Act claim under 41 U.S.C. § 604.
The court DENIES the motions to dismiss the government's common law fraud claims against NACC, CH & A, and Weatherford that arise from the REA, but GRANTS the motions to dismiss the common law fraud claim to the extent it is based on padded waste costs allegations.
The court GRANTS the motion to dismiss the relator's claims against Weatherford for failure to serve process in accordance with FED. R. CIV. P. 4(m). Docket Entry No. 113 is GRANTED to this extent and is otherwise moot.
*534 The court GRANTS the motion filed by GAB to dismiss the relator's amended complaint asserting alter ego, with leave to amend. (Docket Entry No. 105).
The court GRANTS the motion filed by NACC and CH & A to dismiss the relator's amended complaint, with leave to amend. (Docket Entry Nos. 105 and 110).
NOTES
[1] Weatherford International, Inc. was formerly known as Energy Ventures, Inc. or EVI. This court will refer to this defendant as "Weatherford."
[2] The question of whether Rule 9(b) is applicable to all False Claims Act claims has been the subject of some dispute. Rule 9(b) clearly applies to actions for fraud, but "the phrase [`false or fraudulent claim'] has become a term of art," with a statutorily defined scienter that differs from the scienter required in a fraud action. United States ex rel. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir.1999). However, this "liberal scienter requirement" "does not conflict with Rule 9(b), since `[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.'" Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1477 (2d Cir.1995) (quoting FED. R. CIV. P. 9(b)) (alteration in original) (collecting cases).
[3] The Second Circuit has held "that `when a complaint charges fraud, it must (1) detail the statements ... that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements ... were made, and (4) explain why the statements ... are fraudulent.'" Olsen v. Pratt & Whitney Aircraft, a Div. of United Techs. Corp., 136 F.3d 273, 275 (2d Cir.1998) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir.1996) (alterations in original)).

The Fourth Circuit has held that a False Claims Act plaintiff must plead "how [an allegedly false statement] was fraudulent." United States ex rel. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 789 (4th Cir.1999).
The Sixth Circuit reads Rule 9(b) "liberally," "requiring a plaintiff, at a minimum, to `allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Coffey v. Foamex, L.P., 2 F.3d 157, 161-62 (6th Cir.1993) (quoting Ballan v. Upjohn Co., 814 F.Supp. 1375, 1385 (W.D.Mich.1992)).
"What a claim of fraud must include [in the Seventh Circuit] is `particularity' about the details  `the who, what, when, where, and how: the first paragraph of any newspaper story.'" Hemenway v. Peabody Coal Co., 159 F.3d 255, 261 (7th Cir.1998) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).
The circumstances the Eighth Circuit requires a fraud plaintiff to plead "include the time, place, and contents of the alleged fraud; the identity of the person allegedly committing fraud; and what was given up or obtained by the alleged fraud." Roberts v. Francis, 128 F.3d 647, 651 (8th Cir.1997) (citing Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995)).
The Ninth Circuit has held that "`a plaintiff must set forth more than the neutral facts [time, place, and content of an alleged misrepresentation] necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.'" Yourish v. California Amplifier, 191 F.3d 983, 993 (9th Cir.1999) (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir.1994) (en banc)).
The Tenth Circuit "requires a complaint alleging fraud to `set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" Koch v. Koch Indus., 203 F.3d 1202, 1236 (10th Cir. 2000) (quoting Lawrence Nat'l Bank v. Edmonds (In re Edmonds), 924 F.2d 176, 180 (10th Cir.1991)).
In the District of Columbia Court of Appeals, a fraud plaintiff must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." Firestone v. Firestone, 76 F.3d 1205, 1211 (D.C.Cir.1996) (citations and internal quotation marks omitted).
[4] The First Circuit has not explicitly held that there is a how/why element of the Rule 9(b) inquiry, although its cases do not exclude the possibility. "`Rule 9 requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred.'" Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir.1996) (quoting McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir.1980)).

The Third Circuit has adopted a different approach to the Rule 9(b) analysis:
[U]nder Fed.R.Civ.P. 9(b), plaintiffs must plead with particularity the circumstances of the alleged fraud. They need not, however, plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations of fraud. The purpose of Rule 9(b) is to provide notice of the precise misconduct with which defendants are charged and to prevent false or unsubstantiated charges. Courts should, however, apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.
Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir.1998) (internal citations and quotation marks omitted).
The Eleventh Circuit has adopted the Third Circuit standard. "Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule." Durham v. Business Management Assocs., 847 F.2d 1505, 1512 (11th Cir.1988) (citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984); Shared Network Techs., Inc. v. Taylor, 669 F.Supp. 422, 429 (N.D.Ga.1987)).
[5] These include: (1) why the false statement is fraudulent; (2) how the false statement is fraudulent; (3) the fraudulent scheme; (4) the "how" of the fraud; (5) what was given up or obtained by the alleged fraud; (6) why the statement or omission complained of was false or misleading; (7) the consequences of the fraud; and (8) what was retained or given up as a result of the fraud.
[6] But see Isquith v. Middle S. Utils., Inc., 847 F.2d 186, 194 n. 3 (5th Cir.1988) (stating in dictum that where defendants had added excerpts of SEC documents not referred to in the complaint and a "statement of uncontested facts" to a motion to dismiss, the motion would have been better treated as a motion for summary judgment). Isquith does not prevent consideration of documents attached to a motion to dismiss, where those documents are referred to in the complaint and are central to the plaintiff's case. See Sheppard, 158 F.R.D. at 597. In this case, although the defendants tendered only excerpts of some of the documents at issue, the concerns in the Isquith footnote do not apply. The primary documents this court has considered in ruling on this motion to dismiss are the contract and bid proposal between CH & A and ECE, which have been submitted to this court. (Docket Entry No. 58, Ex. A).
[7] The False Claims Act provides that:

Any person who 
(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
...
is liable to the United States Government ....
...
(b) Knowing and knowingly defined.  For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information
(1) has actual knowledge of the information;
(2) acts in deliberate ignorance of the truth or falsity of the information;
or
(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. (c) Claim defined.  For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.
...
31 U.S.C. § 3729.
[8] In United States ex rel. Cantekin v. University of Pittsburgh, 192 F.3d 402 (3d Cir.1999) the Third Circuit, without deciding the issue, cast doubt on the Fourth Circuit's holding that the FCA includes a materiality requirement. This raises the much-debated question of whether a court may properly infer a materiality requirement in statutes providing for either civil or criminal penalties predicated on conduct that is "false," "fraudulent," or both.

The Third Circuit panel in Cantekin cited a footnote in Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) for the proposition "that the term `false statement,' unlike `fraudulent statement,' does not imply a materiality requirement." Cantekin, 192 F.3d at 415 (citing Neder, 119 S.Ct. at 1830 n.7). In Neder, the Supreme Court relied on the framework for materiality inquiries set out in United States v. Wells, 519 U.S. 482, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), holding that the wire, mail, and bank fraud statutes included an unwritten materiality requirement. Under the Wells framework, the Court "first look[s] to the text of the statutes at issue to discern whether they require a showing of materiality." Neder, 119 S.Ct. at 1839. If there is no express reference to materiality in the text of the statute, the Court then looks to the "established meaning" of the terms in the statute. "It is a well-established rule of construction that [w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." Id. at 1840 (quotation marks and citations omitted; alterations in original). The Court went on to hold that the "scheme to defraud" language common to the wire, bank, and tax fraud statutes incorporated the meaning "defraud" had in the context of common-law fraud. Id. at 1841.
Because none of the subsections of the False Claims Act at issue in this case contains express materiality requirements, this court must look to the "established meaning" of the terms in the statute. Application of the second part of the Neder/Wells framework to section 3729(a)(1)-(3) is uncomplicated to the extent it deals with "fraud" or directly related terms. The Court found in Neder that "the well-settled meaning of `fraud' [when the mail, bank, and wire fraud statutes were enacted] required a misrepresentation or concealment of material fact. Indeed, as the sources we are aware of demonstrate, the common law could not have conceived of `fraud' without proof of materiality." Neder, 527 U.S. at 22, 119 S.Ct. 1827 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 579, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); Smith v. Richards, 38 U.S. (13 Pet.) 26, 39, 10 L.Ed. 42 (1839)). Because the mail, bank, and wire fraud statutes were all enacted after the False Claims Act, the established meaning of "fraud" at the time Congress enacted the False Claims Act included a materiality requirement.
Section 3279(a)(3), which includes the language "conspires to defraud," clearly includes a materiality requirement. The application of the Neder/Wells framework to section 3279(a)(1)-(2) is less straightforward. The problematic language is the disjunctive phrase "false or fraudulent claim" in both paragraphs. In Cantekin, the court indicated that the Neder Court's distinction of the term "false statement," which does not include a materiality requirement, from the term "false or fraudulent pretenses, representations, or promises," which does include such a requirement, casts doubt on finding a materiality requirement in the term "false claim." This reading does not take into account the common-law meaning of the term "false claim," which connotes fraud. The cases decided before the to enactment of the False Claims Act indicate that a "false claim" had the common-law meaning of an attempt to obtain or retain title to property by fraudulent means. For example, in The Amiable Isabella, 19 U.S. (6 Wheat.) 1, 5 L.Ed. 191 (1821) (mem.), a prize case, the claimant attempted to hide the British origin and destination of a ship by flying Spanish colors and falsifying the port of destination. The Court held that the claimant could not prevent the United States from seizing the vessel and its cargo as a prize of war, describing the claimant's "false claim" as fraudulent.
The ship, therefore, will not protect the cargo, nor is the latter so documented as to protect itself, or avoid being involved in the same fate with the vessel. To be sure, there are the usual formal documents, and so there are in every case. But they contradict each other; and being fraudulently blended in the same false claim with the ship, they must be included in the same condemnation. Both being alleged to belong to the same claimant, and he having attempted to assert a false claim to the ship, the entire claim must be rejected as a penalty for his fraudulent conduct.
Id., 19 U.S. at 29 (citing The St. Nicholas, 14 U.S. (1 Wheat.) 417, 4 L.Ed. 125 (1816); The Fortuna, 16 U.S. (3 Wheat.) 236, 4 L.Ed. 379 (1818)). Other cases also characterize "false claims" as fraudulent. See, e.g., The Venus, 12 U.S. (8 Cranch) 253, 267, 3 L.Ed. 553 (1814) (holding that claim could not be a "false claim" because "it does not by any means appear, that, in making this claim, Lenox was influenced by a fraudulent motive."); Forbes v. Waller, 25 N.Y. 430, 1862 WL 4681 at *4 (N.Y.1862) ("whether a fraudulent assignee, who had conspired with the debtor to shield the property from execution, and had, by his false claim, made the process at law ineffectual, could take the same objection ... is questionable"); Bourland v. Eidson, 49 Va. (8 Gratt.) 27, 1851 WL 2862 at *5 (Va.1851) ("if a party should obtain the money of another by a fraudulent contrivance, or dishonest breach of trust, or his property by open violence under a false claim of title ...."). The cases decided before enactment of the False Claims Act connect fraud, and hence a materiality requirement, with the term "false claim." Comparison with "false statement" statutes cannot rebut the presumption that Congress intended to incorporate the common-law meaning of the term "false claim" into the False Claims Act. "That rebuttal can only come from the text or structure of the [False Claims Act itself]." Neder, 527 U.S. at 22 n. 7, 119 S.Ct. 1827 (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581). This court follows the cases holding that paragraphs (a)(1), (a)(2), and (a)(3) of section 3729 each include a materiality requirement.
[9] The False Claims Act was amended in 1986 to include, inter alia, the knowledge standard in 31 U.S.C. § 3729(b). Pub.L. 99-562, § 2, Oct. 27, 1986, 100 Stat. 3153.
[10] This application of the materiality test to false statements accords with courts' application of materiality in other contexts. For example, the Fifth Circuit recently interpreted Neder to hold that

The definition of materiality quoted [from Neder] refers to the statements themselves, not whether the recipients of the statements actually relied on them. Although allegations of actual reliance appear to allege materiality, the standards are different. A recipient might actually rely on a false representation, but the representation might not be one to which "a reasonable man would attach importance ... in determining his choice of action," or one that "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."
U.S. v. Richards, 204 F.3d 177, 192 n. 4 (5th Cir.2000) (citing Neder, 119 S.Ct. at 1840 n. 5).
[11] Hagood is a particularly good example, because in that case, the Corps was acting unreasonably: one of the Corps decisionmakers was seeking employment with one of the contractors that stood to gain from the contract in question. See Hagood, 929 F.2d at 1418. Had the Ninth Circuit in Hagood applied the standard the government would have this court adopt, the court could not have held the defendant liable under the False Claims Act because the Corps, acting unreasonably, would have signed the contract whether it knew of the fraud or not.
[12] False certification is both part of a "false claim," section 3729(a)(1), and a "false ... statement," section 3729(a)(2).
[13] To the extent defendants offer a Rule 9(b) motion as to the section 3729(a)(3) claim, the motion is DENIED insofar as it deals with submission of the REA. It is GRANTED to the extent it deals with padded waste costs claims.
[14] There is some uncertainty as to the standard required by section 3729(a)(3). The Fifth Circuit and other courts of appeals have decided section 3729(a)(3) claims without setting forth the elements of the claim. Several district courts have set forth the following elements as a standard for liability under section 3729(a)(3): "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; (2) that one or more conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." Blusal Meats, Inc. v. United States, 638 F.Supp. 824, 828 (S.D.N.Y. 1986), aff'd, 817 F.2d 1007 (2d Cir.1987) (citing Hageny v. United States, 215 Ct.Cl. 412, 570 F.2d 924, 934 (1978); Murray & Sorenson v. United States, 207 F.2d 119, 123 (1st Cir. 1953); United States v. Cripps, 460 F.Supp. 969, 975 (E.D.Mich.1978); United States v. Kates, 419 F.Supp. 846, 851-852 (E.D.Pa. 1976)); see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co., 721 F.Supp. 1247, 1259 (S.D.Fla.1989) (same) (citing Blusal Meats, 638 F.Supp. at 828). It is clear, however, that the damages element of the Blusal Meats test is erroneous. See Miller, 645 F.2d at 476 n. 4; Westinghouse Savannah, 176 F.3d at 785 n. 7 (explicitly disagreeing with the holding in Blusal Meats). The court in Blusal Meats also incorrectly added a damages element to claims under 3729(a)(1) and 3729(a)(2), despite the clear holding in Rex Trailer that damages were not a necessary element of a False Claims Act claim. See JAMES B. HELMER, JR., ANN LUGBILL AND ROBERT CLARK NEFF, JR., FALSE CLAIMS ACT: WHISTLEBLOWER LITIGATION 83 (2d ed. 1999) ("Reliance on Blusal Meats and its progeny for [the proposition that actual damages are required] is misplaced."). The better rule has two elements. A False Claims Act plaintiff must show: (1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) one or more conspirators performed any act to effect the object of the conspiracy. See HELMER at 82.

CH & A claims that conspiracy under the False Claims Act is governed by the standard set forth in a treatise on the subject. (Docket Entry No. 108, p. 26 n. 19). "The elements on conspiracy include: `(1) a claim to the United States, (2) which is false or fraudulent, (3) payment or approval by the government, (4) an agreement to submit that false claim, (5) an act in furtherance of the object of the agreement, and (6) intent to defraud.'" (Docket Entry No. 108, p. 26 n. 19, quoting JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS at 2-25 (Supp.1999)). Element (3) is presumably based on Boese's assertion elsewhere that "[t]he clear language of the statute provides that the claim must be `... allowed or paid ...,' and most courts have noted correctly that damages are a required element of liability under § 3729(a)(3)." JOHN T. BOESE, An Overview of Liability under the False Claims Act, AMERICAN BAR ASSOCIATION CENTER FOR CONTINUING LEGAL EDUCATION NATIONAL INSTITUTE 1998, available in Westlaw, N98CFCB ABA-LGLED B-1 at *B-3 (citing Blusal Meats, 638 F.Supp. at 828). The elements of conspiracy Boese asserts are required by section 3729(a)(3) have increased over the years, although he bases them all on the same Blusal Meats line of cases. In 1993, Boese cited Blusal Meats for the proposition that "[l]iability under subsection 3729(a)(3) requires findings that a false claim was submitted, that there was an agreement to defraud, and that there was at least one act in support of the conspiracy." JOHN T. BOESE, QUI TAM: BEYOND GOVERNMENT CONTRACTS (Practicing Law Institute ed.1993), available in Westlaw, 456 PLI/Lit 7 at *29. In 1997, Boese added the element of a specific intent to defraud, again citing the Blusal Meats line of cases. JOHN T. BOESE, The Science and Art of Defending a Civil False Claims Act Case Brought by a Qui Tam Relator, AMERICAN BAR ASSOCIATION CENTER FOR CONTINUING LEGAL EDUCATION NATIONAL INSTITUTE 1997, available in Westlaw, N97WCCB ABA-LGLED I-1 at *I-4. By 1999, Boese had added the damages element.
Boese's analysis is inconsistent with Rex Trailer and Miller, which held that the False Claim Act provision for a civil penalty apart from damage awards based on actual damages requires an interpretation of the statute that excludes a damages element. The language Boese cites to support his interpretation of the statute, "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," can as easily be interpreted as a limitation on the kind of conspiracies to defraud that may properly result in liability under the statute  conspiracies that have as their object "getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). See HELMER at 82-83.
[15] Rule 9(b) is not applicable to the alter ego when fraud has properly been alleged against the principal. See, e.g., International Controls Corp. v. Vesco, 490 F.2d 1334, 1351 n. 23 (2d Cir.1974).
[16] Although Rule 12(b)(6) motions to dismiss alter ego claims normally come in the context of jurisdictional challenges, courts will dismiss alter ego claims where the plaintiff "alleges no facts that, if proved, would ... permit a court to impose liability on [defendant] for the acts of its parent [or subsidiary] under an alter ego theory." Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir.1993). See also Koehler v. Bank of Bermuda (N.Y.) Ltd., 209 F.3d 130, 2000 WL 364993 at *7 (2d Cir.2000); Smith v. Dainichi Kinzoku Kogyo Co., 680 F.Supp. 847, 855 (W.D.Tex.1988).
[17] The government's common law fraud claim does not appear to rest on allegations of padded waste costs, but to the extent it does, that part of the common law fraud claim is not pleaded with particularity.
[18] In an instructive case, Williams Patent Crusher & Pulverizer Co. v. Lyth Tile Co., 150 N.Y.S. 6 (N.Y.Sup.Ct.1914), the court held that a plaintiff could recover the costs of investigating a machine it had contemplating purchasing, even though the plaintiff did not purchase the machine, where the defendant had fraudulently induced the plaintiff to make the investigation. The court held that although there is a distinction between fraudulently induced contracts and fraudulently induced investigations, either may support a fraud claim. "The counterclaim is not for damages for deceit in inducing defendant to buy a machine, but for damages for deceit in inducing it to spend time and money in a useless and frivolous examination during negotiations for a purchase that was not made." Id. at 7.
[19] NACC's sole argument is the following: "Further, NACC hereby respectfully submits that the arguments set forth in the above joined and incorporated documentation likewise apply equally to those portions of the United States' Second Amended Complaint which allege a violation of the Contracts Dispute Act based upon the same underlying allegations as the other counts, but which violation [sic] is directed only to NACC." Id.